IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| v. | : | NO. 06-0445 |
| HASSAN WILCOX | : | |

_____

**Diamond, J**                                                                                           **August 28, 2007**

## MEMORANDUM

On September 1, 2005, Philadelphia Police arrested Defendant, Hassan Wilcox, for drug dealing, searched his car, and took an incriminating statement from him. Defendant has moved to suppress. I reject Defendant's challenge to his arrest and the search of his car. Because the Police obtained Defendant's statement after he twice asked for a lawyer, however, I am compelled to suppress his statement.

Pursuant to Fed. R. Crim. P. 12(d), I make the following factual findings and legal conclusions.

## FINDINGS OF FACT

On May 9, 2007 and May 15, 2007, I conducted a suppression hearing. The Government presented the testimony of Philadelphia Police Officers John Coyne, Iran Millan, Wayne Arnold and Michael Williams, and Bensalem Township Police Officer Christine Kelliher. Defendant testified on his own behalf, and presented the testimony of his girlfriend Ashley Griffin, and Craig Lindsey. Except where noted, I find that the following facts have been proven by a preponderance of the evidence.

1

1.     On the morning of Thursday, September 1, 2005, Agents of the Drug Enforcement Administration and Officers assigned to the Philadelphia Police Department's Intensive Drug Investigation Squad executed a search warrant on 5040 North 8th Street in Philadelphia, Pennsylvania. (Suppression Hr'g Tr. 4:14-16, 82:19-83:2, May 9, 2007 ("Day 1 Tr.")). The Officers and Agents seized the following items belonging to the occupant of the house, Craig Lindsey: 253 grams of cocaine, 294 grams of crack, $12,082, a .45 caliber handgun loaded with eight live rounds of ammunition, other live ammunition, and drug paraphernalia. (Day 1 Tr. 23:17-19, 23:23-24:22, 130:1-15). Police arrested Lindsey and took him to IDIS Headquarters. (Day 1 Tr. 4:17-5:2, 83:6-9).

2.     After Lindsey agreed to help the Police, he made a phone call to his cocaine supplier -- a man he knew as "Chop." (Day 1 Tr. 5:3-24, 84:5-11). The Police could hear only Lindsey's part of the conversation. (Day 1 Tr. 84:14-85:2). Lindsey told Chop to deliver a kilogram of cocaine to Lindsey's house on 5040 North 8th Street. (Day 1 Tr. 5:9-20, 85:10-16). Lindsey said that Chop was a 26 year old black male, 5'8", with a medium brown complexion and a thin build. (Day 1 Tr. 102:6-7, 102:21, 6:5-11, 28:21, 101:18). Lindsey did not know Chop's real name or address. (Day 1 Tr. 102:9-10, 101:23-102:1, 102:15-16). Lindsey stated that Chop drove a black Pontiac and a green Pontiac Bonneville (both with tinted windows), (Day 1 Tr. 10:8-14, 85:20-24), and stated that he had seen the black car "once or twice" before. (Day 1 Tr. 141:17-19).

3.     DEA Agents and IDIS Officers then returned Lindsey to his home at 5040 North 8th Street and set up a surveillance team. (Day 1 Tr. 6:18-21). Officer Millan was stationed in the first floor back kitchen, Officer Coyne in the living room near the front door, and Officer Arnold at a window near the front door. (Day 1 Tr. 7:14-9:3, 143:17-21, 147:5-9). Lindsey sat on a chair in front of the door on the cement patio outside the house. (Day 1 Tr. 8:18-20). Other Officers were

2

stationed in cars on the 5000 block of North 8th Street and on neighboring blocks. (Day 1 Tr. 30:7-31:17, 87:14-18, 163:16-164:4). Sergeant Monaghan, Officer Peter Sarris, and Officer Michael Williams were stationed in a car a few blocks away from 5040 North 8th Street. (Day 1 Tr. 30:21-24, 163:16-164:4). The Officers communicated with each other over handheld radios. (Day 1 Tr. 87:14-17, 164:5-6). Officer Arnold did not have a radio, but was able easily to communicate with Lindsey and the other Officers in the house during the surveillance. (Day 1 Tr. 33:17-19, 87:157-18, 145:9-10).

4.  The Police instructed Lindsey to tell Officer Arnold when Chop arrived. (Day 1 Tr. 8:2-5, 149:1-4). Officer Arnold would, in turn, inform the other Officers on the scene. (Day 1 Tr. 8:2-5, 149:8-10). Officer Coyne would then signal for all the Officers to apprehend the suspect. (Day 1 Tr. 8:2-5).

5.  At approximately 2:55 p.m., Police saw a black Pontiac enter the 5000 block of North 8th Street and park partially in front of 5040. (Day 1 Tr. 9:24-10:7, 75:19-76:7, 149:21-150:7). As the car pulled to a stop, Lindsey told Officer Arnold that the driver was the man he knew as Chop – later identified as Defendant, Hassan Wilcox. (Day 1 Tr. 9:7-9, 11:5-12, 145:25). Officer Arnold observed that when Defendant left his vehicle, Lindsey acknowledged him by saying, "What's up Chop?". (Day 1 Tr. 145:16-25). It also "appeared that [Chop] may have said something . . . to [Lindsey]." (Day 1 Tr. 12:22-24). Coyne directed the other Officers to approach and stop Defendant. (Day 1 Tr. 9:7-11, 11:1-4).

6.  Less than one minute after Defendant left his car, Police approached him from both directions of North 8th Street. (Day 1 Tr. 31:13-17, 103:12-14, 137:15-18). During that minute, Officer Arnold, who was stationed at the front window of the house, saw Defendant walk to the rear

of the vehicle, open the trunk for several seconds, and slam the trunk shut.  (Day 1 Tr. 145:18-22).  When he saw the Police approach, Defendant attempted to flee, throwing his car keys to the ground.  (Day 1 Tr. 154:3-12, 165:17-20, 146:1-2, 146:16).  Officer Sarris apprehended Defendant -- who had run only a few feet -- and placed him in handcuffs.  (Day 1 Tr. 40:13-15, 103:24-25, 165:17-20).  Police patted Defendant down, but found no contraband or weapons on him.  (Day 1 Tr. 14:4-12).

       7.      Police placed Defendant in the backseat of a Highway Police car.  (Day 1 Tr. 14:4-18).  At this point, Defendant was not free to leave.  (Day 1 Tr. 108:4-9).

       8.      After Defendant was apprehended, Officer Coyne contacted Bensalem Township K-9 Officer Christine Kelliher and asked her to bring a dog to the scene and perform a "K-9 sniff."  (Day 1 Tr. 13:23-14:1; Suppression Hr'g Tr. 3:13-14, May 15, 2007 ("Day 2 Tr.")).  At approximately 3:55 p.m., Detective Kelliher arrived at 5040 North 8th Street with Cosmo, a dog trained and certified by the United States Police K-9 Association to indicate the presence of various narcotics, including cocaine.  (Day 1 Tr. 47:22-25; Day 2 Tr. 6:24-7:1, 14:9; Def's Ex. 30).  Detective Kelliher placed Cosmo at the Pontiac's driver side front bumper and walked the dog counter-clockwise around the vehicle, telling Cosmo to "find the dope."  (Day 2 Tr. 7:1-4, 19:8-14).  Detective Kelliher informed Officer Millan that Cosmo had "alerted" to the presence of narcotics in the car's rear trunk area.  (Day 1 Tr. 37:22-23; Day 2, Tr. 7:22-24, 22:5-7).

       9.      An unidentified Officer standing by the Pontiac's open door then told Detective Kelliher that there was a strong smell of cocaine coming from inside the car.  (Day 2 Tr. 7:24-8:2, 24:18-25:7).  Detective Kelliher opened the driver side back door and instructed Cosmo to "find the dope."  (Day 2 Tr. 8:4-5, 25:9-26:5).  Cosmo jumped into the car and indicated the presence of narcotics in the vehicle's passenger compartment.  (Day 2 Tr. 25:9-26:21).  Although the Police

found no drugs there, Cosmo's reaction established that it was likely that narcotics had recently been kept in the passenger compartment. (Day 2 Tr. 10:3-5, 31:7-32:9).

10.     Officer Williams then drove the Pontiac to IDIS headquarters, where the Police watched the car while they waited for the issuance of a search warrant. (Day 1 Tr. 165:21-166:5). Williams -- a very experienced narcotics officer -- smelled a strong odor of what he credibly recognized as cocaine in the car. (Day 1 Tr. 166:6-8, 174:20-23). The vehicle was identified as a 2004 Black Pontiac Grand Am PA Plate GDT-6659 Vehicle Identification Number 2G2WR524X41274236, which was registered to George Smith, residing at 826 South 57th Street, Philadelphia, PA 19120. (Day 1 Tr. 19:14-19; Def.'s Ex. 1; Govt.'s Ex. 1).

11.     Intending to search the car again, Officer Coyne prepared a warrant application and supporting affidavit. (Day 1 Tr. 34:21-35:1; Govt.'s Ex. 1). The affidavit included information from an unnamed Confidential Informant, who was actually Craig Lindsey. (Day 1 Tr. 43:8-10). The affidavit provided that the C.I. had informed the Police that on Thursday, September 1, 2005, Craig Lindsey was going to receive a substantial amount of cocaine from an individual known as Chop. (Def's Ex. 3). The affidavit also provided that the C.I. had told the Police that Chop would transport the drugs in either a black Pontiac with tinted windows, or a green Pontiac Bonneville with tinted windows. The C.I. described Chop as a 26 year old black male, 5'8", with a thin build, and a brown complexion. The affidavit set out how the Police had seen Chop (the Defendant) arrive on the scene, and how he had attempted to flee when approached by Police. The affidavit also set out how Cosmo indicated that narcotics were in the trunk area of the black Pontiac that Hassan Wilcox drove to Lindsey's home. (Def's Ex. 3). Finally, the affidavit provided that Officer Williams could smell a strong odor of cocaine inside the vehicle. (Def's Ex. 3).

To protect Lindsey's identity and safety, Officer Coyne did not identify Lindsey in the affidavit as the C.I. The affidavit thus did not contain any information concerning the C.I.'s extensive criminal history. (Day 1 Tr. 44:8-10; Govt.'s Ex. 1). The affidavit also did not disclose that the Police had, earlier that same day, arrested the C.I. and recovered drugs, a gun, and ammunition from his residence, or that the C.I. hoped to mitigate his punishment by helping the Police. (Day 1 Tr. 43:11-21).

12. Based on the affidavit, Bail Commissioner Polokoff issued a warrant to search Defendant's car. (Def's Ex. 3).

13. The Police then searched the Pontiac and recovered approximately 1100 grams of cocaine from the rear trunk hidden in a plastic bag containing a cereal box holding nine clear plastic baggies knotted at the top and containing the drugs. At that time, the Police also recovered from the car's passenger compartment inculpatory documentary evidence: an address book, letters, and the like. (Day 1 Tr. 19:22-20:1, 57:19-60:21).

14. The Police videotaped the search and made copies of the videotape. (Day 1 Tr. 52:5-6, 56:9-11). The copies and originals were handed to Officer Coyne by the Officer who made the tape. (Day 1 Tr. 56:21-24). Unfortunately, Officer Coyne inadvertently lost the original tape and the copies. (Day 1 Tr. 55:5-15, 56:9-15). The tape included no evidence or information of apparent exculpatory value.

15. After Officer Kelliher arrived at 5040 North 8th Street, the Police took Defendant to IDIS Headquarters, at 5301 Tacony Street, arriving at approximately 4:00 p.m. (Day 1 Tr. 106:10-12). The Police had the express intention of securing a statement from Defendant at that time. As

Officer Coyne testified, "we were going to see if he would cooperate, if he would give a statement." (Day 1 Tr. 41:17-20).

16. Although the Police never told him he was under arrest, Defendant was not free to leave. (Day 1 Tr. 108:2-6; Day 2 Tr. 51:9-17, 58:23-25). For several hours, the Police held Defendant in a "supply closet" that was six feet wide and twelve to fifteen feet long. Officer Millan described it as "a crowded, little room." ( Day 2 Tr. 60:14-17; Day 1 Tr. 92:23-93:12).

17. During Defendant's time in this room, the Police spoke to him for more than four hours before giving him Miranda warnings. (Day 1 Tr. 63:2-6; Day 2 Tr. 46:8-64:22). Officer Millan testified that before giving Defendant any Miranda warnings, he repeatedly told Defendant he was in a tight situation and that he needed to think about his children, and repeatedly asked Defendant questions about his alleged offense. (Day 2 Tr. 47:3-18). Defendant made no inculpatory admissions at that time. (Day 1 Tr. 111:14-17). This pattern continued throughout the course of the afternoon and evening. (Day 2 Tr. 47:24-49:24). Officer Millan testified that during this time, before giving Defendant Miranda warnings: (1) he was "trying to get [Defendant] to cooperate to help himself out," (Day 1 Tr. 109:9-18); (2) he was trying to get Defendant to "tell me what happened that day," (Day 1 Tr. 109:12-14, 109:19-21); (3) he believed that Defendant had engaged in a drug transaction and that he wanted Defendant to "talk," (Day 1 Tr. 109:19-110:8); (4) he told Defendant that the case was going to "go to federal," thus ensuring that Defendant faced a longer jail sentence. (Day 1 Tr. 111:1-6). Officer Millan also testified that in explaining the longer federal sentence Defendant faced, he reviewed the Federal Sentencing Guidelines with Defendant. (Day 1 Tr. 113:20-114:1). Officer Millan told Defendant "that the dog hit on the car and that we were going

7

to get a search warrant." (Day 1 Tr. 124:23-24) Finally, Officer Millan testified that he told Defendant it would help him if he cooperated. (Day 1 Tr. 112:7-8).

18. Defendant testified as follows: Before receiving any Miranda warnings, he asked to make a phone call to his lawyer. (Day 2 Tr. 52:17-22). Officer Milan asked him, "who is your lawyer?" (Day 2 Tr. 52: 20-21). When Defendant responded that his lawyer was Frank Spina, Officer Millan said Defendant was going to need "somebody better than him." (Day 2 Tr. 52:20-22). The Police then allowed Defendant to call his girlfriend, Ashley Griffin. (Day 1 Tr. 94:5-10, 115:5-6; Day 2 Tr. 52:23, 54:5-8). Millan and another Officer were standing next to Defendant while he made his phone call. (Day 2 Tr. 54:9-11). When Defendant told Ms. Griffin that he had been arrested, she began crying. (Day 2 Tr. 54:22). Defendant then passed the phone to Officer Millan, who confirmed that Defendant was indeed in Police custody. (Day 2 Tr. 55:2-7). Officer Millan returned the phone to Defendant, who told Ms. Griffin to go to his mother's house to retrieve his lawyer's phone number from various personal papers. (Day 2 Tr. 55:8-18). During Defendant's conversation with Ms. Griffin, Officer Millan was standing beside him and could hear what he was saying. (Day 2 Tr. 54:9-11).

19. Ms. Griffin testified that when she spoke to Defendant, a "Detective Ivan" got on the phone and confirmed that Defendant was in custody. (Day 1 Tr. 188:16-189:1). When "Detective Ivan" returned the phone to Defendant, he told Ms. Griffin "to go get his lawyer's information"… "from his mother's house…" and "contact his lawyer." (Day 1 Tr. 189:6-24).

20. Officer Millan failed to contradict the testimony of Defendant and Ms. Griffin that Defendant asked to speak to his lawyer. Rather, Officer Millan's testimony was, at points, unclear and evasive. For instance, during his cross-examination, he testified as follows:

8

> Q: And [Defendant] said he wanted to call his lawyer and he wanted to call his family, didn't he?
> A: He wanted to call his baby's mother.
> Q: And in fact, he told you that his lawyer was Frank Spina, didn't he?
> A: I don't recall.
> Q: You don't recall, he might of?
> A: I don't recall who he said his lawyer was.
> Q: And didn't you tell him that he was going to need a better lawyer than Mr. Spina?
> A: I don't even know who Frank Spina is.

(Day 1 Tr. 114:5-15). More disturbing, when asked if Defendant told Ms. Griffin to contact his lawyer, Officer Millan testified that he could not recall:

> Q: And he asks his girlfriend to go get information about his lawyer and to contact his lawyer, doesn't he?
> A: I don't recall
> Q: You don't recall?
> A: No

(Day 1 Tr. 116:5-12).

21. In light of Officer Millan's inability to recall, the evasive nature of his answers, and Ms. Griffin's corroboration of Defendant's version of events, I credit the testimony of Defendant and Ms. Griffin that Defendant asked Officer Millan if he could call his lawyer, and then asked Ms. Griffin to contact his lawyer.

22. Having twice requested counsel, Defendant initiated no further communications, exchanges, or conversations with the Police. On the contrary, the Police continued to press Defendant to make a statement. (Day 2 Tr. 56:16-25, 57:1-14, 58:1-25, 59:1-25).

23. Eventually, Officer Coyne returned to the supply closet and told Defendant he was going to get a search warrant for the Pontiac. (Day 1 Tr. 61:23-25).

24. Some time after 8:05 p.m., the Police finally informed Defendant of his Miranda

9

rights. (Day 1 Tr. 63:21-65:9). Defendant effectively admitted at the suppression hearing that he waived those rights. (Day 2 Tr. 60:14-23). In light of the circumstances, however, I find that his Miranda waiver was not voluntary.

25. Defendant then admitted to the Police that he possessed the kilo of cocaine in the trunk of the Pontiac, and that he intended to sell it to someone named "Juice." Defendant signed a brief written statement to this effect. (Day 1 Tr. 96:19-25; Govt.'s Ex. 2).

## CONCLUSIONS OF LAW

Defendant contends that the Police violated the Fourth Amendment when they arrested and searched him, and that the warrantless search of the car was thus the fruit of that illegal seizure. In addition, Defendant argues that the second search of the car was conducted pursuant to an invalid warrant because the issuing official relied on a deliberately or recklessly false supporting affidavit. Defendant also argues that I should suppress the evidence from the second search because the Police lost the videotape they made during the search. Finally, Defendant contends that the statement he made to the Police was involuntary.

The movant generally bears the burden of proving that evidence should be suppressed. United States v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995). Once the movant establishes that the police conducted a warrantless search or seizure, however, the burden shifts to the Government to show that the search or seizure was reasonable. Id. Subject to a few specifically established and well-delineated exceptions, warrantless searches are *per se* unreasonable. United States v. Ross, 456 U.S. 798, 824-25 (1982).

The Police violate a Defendant's due process rights if, acting in bad faith, they destroy evidence with apparent exculpatory value.  In very limited circumstances, such a transgression could compel me to suppress evidence that is the fruit of that violation.  See United States v. Seibart, 148 F. Supp. 2d 559 (E.D. Pa. 2001) (applying Arizona v. Youngblood, 488 U.S. 51 (1988) and California v. Trombetta, 467 U.S. 479 (1984)); United States v. Elliott, 83 F. Supp. 2d 637, 648-49 (E.D. Va. 1999) (same).  The Third Circuit has explained:

> As a general matter, [however,] even when actions by the prosecution appear to deprive a criminal defendant of his constitutional right to present a defense, no remedy will lie for such infringement absent a showing that the government caused the unavailability of material evidence and has done so in bad faith.

United States v. Santtini, 963 F.2d 585, 596-97 (3d Cir. 1992) (citing Arizona v. Youngblood, 488 U.S. 51, 57 (1988)).  The "defendant has the burden of showing bad faith on the party of the police. . . ."  United States v. Seibart, 148 F. Supp. 2d 559, 568 (E.D. Pa. 2001) (citing Arizona v. Youngblood, 448 U.S. 51, 58 (1988)).  "Mere negligence on the part of the police . . . does not support a due process violation."  Id.

The Government must prove that a defendant's statement was voluntary.  Colorado v. Connelly, 479 U.S. 157, 168-69 (1986).  The Fifth Amendment requires police to provide a suspect with Miranda warnings before they subject him or her to a custodial interrogation.  See Miranda v. Arizona, 384 U.S. 436, 444 (1966).  As the Miranda Court stated: "[A] heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel."  Miranda v. Arizona, 384 U.S. 436, 475 (1966) (citing Escobedo v. Illinois, 378 U.S. 478, 490 n.14 (1964)).

### A.     Warrantless Arrest of Defendant

Although the Government suggests otherwise, Defendant was plainly under arrest when the Police initially apprehended him outside Lindsey's home.  See United States v. Frost, 999 F.2d 737, 740 (3d Cir. 1993) (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980)) ("We conclude that a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.").  That arrest was entirely proper.  The police may arrest an individual in a public place if they have probable cause to believe that the person is committing a felony.  United States v. McGlory, 968 F.2d 309, 342 (3d Cir. 1992) (citing United States v. Watson, 423 U.S. 411, 421 (1976)).  Probable cause is "defined in terms of facts and circumstances 'sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.'"  Gerstein v. Pugh, 420 U.S. 103, 111 (1975) (quoting Beck v. Ohio, 379 U.S. 89, 91 (1964)).  "The determination that probable cause exists for a warrantless arrest is fundamentally a factual analysis that must be performed by the officers at the scene."  United States v. Glasser, 750 F.2d 1197 (3d Cir. 1984).  In deciding whether the officers made the correct analysis, I must look at the objective facts available to the officers at the time of arrest, and assess the "totality of the circumstances."  See id. at 1205 (citing Illinois v. Gates, 462 U.S. 213 (1983)).

The Police certainly had probable cause to arrest Defendant.  The Officers heard Lindsey phone his narcotics supplier, "Chop," order a kilogram of cocaine, and arrange to have Chop deliver the drugs to Lindsey's home.  Lindsey described Chop's age, build, complexion, and height.  Lindsey told the Police that Chop would likely drive a black Pontiac to deliver the

cocaine. When Defendant drove up to Lindsey's house in a black Pontiac, Lindsey identified Defendant as Chop to Officer Arnold, who witnessed Lindsey greet Defendant as "Chop." Defendant closely resembles Lindsey's description of Chop. When the Police approached Defendant, he tried to flee and discard his car keys. Those facts undoubtedly gave the Police probable cause to believe that Defendant was committing the felony of narcotics dealing. Accordingly, they properly placed him under arrest without a warrant.

### B.     Searches of the Pontiac

Defendant next challenges the two car searches the Police conducted: (1) the search by Cosmo and the Officers of the car's passenger compartment; and (2) the full search performed pursuant to a warrant. Both of the challenges fail.

#### 1.     The Initial Search of the Car's Interior

Significantly, the Police seized nothing during this search. Accordingly, were I to conclude that the search was invalid, there is no seized evidence to suppress. Although his Motion is unclear, Defendant may seek suppression of the statement by the unidentified Officer that he smelled cocaine in the car's interior. Assuming that remark was the fruit of a search, I decline to suppress because the search was proper.

"The automobile exception to the warrant requirement permits law enforcement to seize and search an automobile without a warrant if 'probable cause exists to believe it contains contraband.'" United States v. Burton, 288 F.3d 91, 100 (3d Cir. 2002) (quoting Pennsylvania v. Labron, 518 U.S. 938, 940 (1996)). The Third Circuit has held that the "automobile exception" allows for the warrantless search of any area of a vehicle, including containers, that may harbor

13

such evidence.  United States v. Salmon, 944 F.2d 1106, 1123 (3d Cir. 1991) (citing United States v. Ross, 546 U.S. 798, 825 (1982)).

In this case, the Police had probable cause to enter the car and search for drugs.  They had just apprehended Defendant, who (they had been told) was Lindsey's drug supplier and would be delivering a kilogram of cocaine.  Defendant was driving the car in which Lindsey said Chop would bring his drugs.  Defendant had also attempted to flee and discard his keys when the Police approached him.  Cosmo had indicated that drugs were present in the rear trunk area of the car.  These combined circumstances undoubtedly gave the Police probable cause to believe that contraband was in the Pontiac.  Indeed, these circumstances are indistinguishable from those the Burton Court deemed adequate to justify a warrantless car search.  288 F.3d 91 (3d Cir. 2002).  Thus, under Chambers, Burton, and Acevedo, that warrantless search of the passenger compartment was permissible.

### 2.  **The Car Search Pursuant to a Warrant.**

Defendant apparently concedes that Officer Coyne's affidavit afforded the Bail Commissioner a "substantial basis" for issuing the warrant authorizing the search of the Pontiac.  Illinois v. Gates, 462 U.S. 213, 238-39 (1983).  Defendant nonetheless contends that the warrant was inadequate because the affidavit was deliberately or recklessly false.  See United States v. Hodge, 246 F.3d 301, 305 (3d Cir. 2001).  Defendant argues that the affidavit falsely provided that Lindsey told the Police Defendant's actual age and height, and omitted key information about the C.I. (Lindsey) himself -- namely, that his cooperation was the result of his arrest earlier that day, and that he had an extensive criminal record.

Defendant ignores that under Burton, Chambers, and Acevedo, the Police likely could have searched the entire car -- including the trunk -- without obtaining a warrant. See California v. Acevedo, 500 U.S. 565, 569-70 (1991); Chambers v. Maroney, 399 U.S. 42 (1970). In any event, the warrant was adequate. "Under the doctrine established in Franks v. Delaware, [a] defendant's motion to suppress evidence is granted if he can demonstrate: (1) that the police recklessly omitted evidence from a warrant affidavit, and (2) that the determination of probable cause hinged on the omitted material." United States v. Sanchez, No. 06-1931, 2007 WL 2189419 (3d Cir. July 31, 2007) (slip copy) (citing United States v. Calisto, 838 F.2d 711, 714-16 (3d Cir. 1988)). Defendant cannot satisfy either prong of this test.

Defendant has not established that Officer Coyne's affidavit was deliberately or recklessly false. Coyne credibly testified he did not disclose that Lindsey was the C.I., or any other identifying information about Lindsey (such as his earlier arrest or criminal record) because he was seeking to protect Lindsey's identity both for reasons of safety and to ensure Lindsey's continue assistance with other investigations.

In any event, it is apparent that the inclusion of the "omitted material" would not have changed the determination of probable cause. First, I credit Officer Coyne's testimony that Lindsey provided the Police with an accurate description of Defendant's age and height. Moreover, the affidavit provided that a C.I. had told the Police that Lindsey was going to receive a substantial amount of cocaine from an individual named Chop, and that Chop would arrive in either a black or green Pontiac. The affidavit provided that the Police had observed Chop's arrival and flight. Finally, the affidavit included a description of Cosmo's indication that

narcotics were in the trunk area of the car. In these circumstances, the affidavit would certainly have been adequate even if it had included the omitted information about the C.I.

### 3. **The Lost Videotape.**

I have found that the loss of the videotape was inadvertent, and that the tape included nothing exculpatory. In these circumstances, the law does not require me to suppress the evidence seized during the search. See U.S. v. Santtini, 963 F.2d 585, 596-97 (3d Cir. 1992) (citing Arizona v. Youngblood, 488 U.S. 51 (1988)).

### C. Defendant's Statement

The Supreme Court and the Circuits have repeatedly held that "the police must terminate interrogation of an accused in custody if the accused requests the assistance of counsel." Minnick v. Mississippi, 498 U.S. 146, 147 (1990) (citation omitted). See also, Edwards v. United States, 451 U.S. 477, 484-85 (1981); Howard v. Moore, 131 F.3d 399, 410-11 (4th Cir. 1997) (discussing the rule announced in Edwards); Alston v. Redman, 34 F.3d 1237, 1243 (3d Cir. 1994) (same). The suspect need make only "some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney *in dealing with custodial interrogation by the police.*" McNeil v. Wisconsin, 501 U.S. 171, 178 (1991) (emphasis in the original). The Supreme Court has cautioned:

> [W]hen an accused has invoked his right to have counsel present during a custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights . . . unless the accused himself initiates further communication, exchanges, or conversations with the police.

Edwards v. United States, 451 U.S. 477, 484-85 (1981).

The Police placed Defendant in custody soon after he got out of his car in front of Lindsey's home. That custody continued at IDIS headquarters, where , before giving Defendant Miranda warnings, the Police immediately began interrogating him, and continued the custodial interrogation for the ensuing four hours or more. Although Defendant twice asked for counsel before he was given Miranda warnings, the Police ignored his requests and continued their interrogation. As I have found, after requesting counsel, Defendant initiated no further "communications, exchanges or conversations with the police." Edwards, 451 U.S. at 484-85. Rather, the Police continued to interrogate Defendant after he asked for counsel. In these circumstances, Defendant's statement was necessarily obtained in violation of the Fifth Amendment. See Alston v. Redman, 34 F.3d 1237, 1242-43 (3d Cir. 1994) (discussing Edwards v. United States, 451 U.S. 477 (1981)).

That Police gave him Miranda warnings before Defendant confessed does not alter this conclusion. Once Defendant requested counsel, his subsequent waiver was not valid. See Minnick v. Mississippi, 498 U.S. 146, 150 (1990) (quoting Michigan v. Harvey, 494 U.S. 344, 350 (1990)) ("Edwards is 'designed to prevent police from badgering a defendant into waiving his previously asserted Miranda rights."). Moreover, as I have found as a fact, Defendant's Miranda waiver was not voluntary.

## **CONCLUSION**

In sum, I will grant Defendant's Motion in part, and suppress his statement to the Police.

An appropriate Order follows.

/s/ Paul S. Diamond

_____

**Paul S. Diamond, J.**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL ACTION** |
| | : | |
| v. | : | |
| | : | NO. 06-0445 |
| **HASSAN WILCOX** | : | |
| | : | |

**ORDER**

AND NOW, this 28th day of August, 2007, upon consideration of Defendant's Motion to Suppress Evidence (Doc. No. 20), the Government's Response to Defendant's Motion to Suppress (Doc. No. 30), Defendant's Proposed Findings of Fact and Conclusions of Law (Doc. No. 44), the Government's Proposed Findings of Fact and Conclusions of Law (Doc. No. 45), and the testimony and evidence from the evidentiary hearings conducted on May 9 and May 15, 2007 it is hereby ORDERED that Defendant's Motion is **GRANTED** with respect to his statement to the Police, and **DENIED** in all other respects.

AND IT IS SO ORDERED.

/s/ Paul S. Diamond
_____
**Paul S. Diamond, J.**